**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
―――――――――――――――――――――――――――――

**YVETTE WILLIAMS O/B/O TATIANA**
**BUCHANAN,**

                    **Plaintiff,**          **07 Civ 4134 (JGK)**

**- against -**                             **OPINION AND ORDER**

**MICHAEL J. ASTRUE, COMMISSIONER OF**
**SOCIAL SECURITY,**

                    **Defendant.**
―――――――――――――――――――――――――――――

**JOHN G. KOELTL, District Judge:**

     The plaintiff Yvette Williams ("Williams"), on behalf of

her minor niece and ward Tatiana Buchanan ("Tatiana"), brings

this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking

reversal of a final determination of the Commissioner of Social

Security Michael J. Astrue ("the Commissioner") that the

plaintiff was not entitled to Supplemental Security Income

("SSI") under the Social Security Act ("SSA").  The plaintiff

moves for judgment on the pleadings, pursuant to Fed. R. Civ. P.

12(c), requesting remand solely for the calculation of benefits

on the grounds that the record provides persuasive proof of

Tatiana's disability.  In response, the Commissioner moves to

reverse the Commissioner's decision and to remand the case for

further proceedings pursuant to the fourth sentence of § 405(g).

The Commissioner concedes that the Administrative Law Judge

("ALJ") did not fully develop the record, and therefore the case

should be remanded. However, the Commissioner contends that the claimant's right to benefits is not so clear that the remand should be made solely for the calculation of the amount of benefits.

The plaintiff filed an application for SSI benefits on January 28, 2005, alleging that Tatiana had been disabled since January 1, 2005. (R. at 41-43.) In a letter dated April 6, 2005, the Commissioner denied the plaintiff's application. (R. 32-35.) The plaintiff filed a timely hearing request and received a hearing before an ALJ on November 28, 2006. (R. at 36, 214-38.) The ALJ considered the case de novo and issued a decision on December 19, 2006 denying the plaintiff's claim. (R. at 16-24.) The decision became the Commissioner's final decision on May 10, 2007, when the Appeals Council denied the plaintiff's request for review of the ALJ's decision. (R. at 4-6.) This appeal followed.

## I.

The administrative record contains the following facts. Tatiana Buchanan was born on November 7, 1995. (R. at 19, 41.) When her application was filed, on January 28, 2005, Tatiana was a school-age child.[1] (R. at 220.)

---

[1] Since Tatiana does not base her claim of disability on physical impairments, the Court will focus on her alleged mental impairments.

On April 17, 2001, at the age of five, Tatiana received her first Occupational Therapy Evaluation by William Dease of the New York City Department of Education. (R. at 118-23.) In the evaluation, Dease observed that Tatiana had difficulty following two-step commands, had to be redirected to tasks 1-2 times before completion, and displayed deficits in attention span, visuo-motor skills, perceptual skills, problem solving, graphomotor skills, and postural stability. (R. at 118-19.) Dease therefore recommended that Tatiana receive further Occupational Therapy during thirty minute sessions, two times per week. (R. at 119.)

In February 2002, Tatiana's first grade teacher at P.S. 226 referred Tatiana for a psychological evaluation, because Tatiana was having a difficult time with fine and gross motor movements, resulting in academic delays. (R. at 162, 166.) On March 12, 2002, the evaluating psychologist administered the Wechsler Intelligence Scale for Children, 3rd Edition ("WISC-III") and the Bender Gestalt test. (R. at 166.) The WISC-III indicated that Tatiana tested largely within the average range, but her score on the recall of information portion of the test was modestly below the average level. (R. at 168.) The results of the Bender Gestalt test, on the other hand, indicated that Tatiana was experiencing significant delays. (R. at 170.) The evaluator thus recommended that Tatiana have her motor

functioning and reading functions further assessed.[2] (R. at 171.)

On December 3, 2003, school psychologist Dr. Jennifer Pereira re-evaluated Tatiana, and found that Tatiana's problems retaining information and sustaining attention were affecting her academic progress. (R. at 114.) Tatiana was repeating the second grade and receiving Special Education Teacher Support Services and occupational therapy when she was re-evaluated. (R. at 114.) Tatiana's teacher indicated to Dr. Pereira that Tatiana experienced problems with basic mathematic computation and that "Tatiana has problems recalling factual information, is easily distracted, and takes a great deal of time to begin and complete tasks." (R. at 114.) During the re-evaluation, Dr. Pereira observed that "[Tatiana] is a very sweet child who puts forth a great deal of effort into her classwork, but nonetheless struggles to keep up." (R. at 114.) Because Tatiana's March 2002 WISC-III test results were "still timely and valid" as of December 2003, Dr. Pereira determined that it was unnecessary to re-administer the WISC-III. (R. at 115). Based on Tatiana's performance on the WISC-III in 2002, Dr. Pereira concluded that Tatiana's full scale IQ was average. (R. at 115.) Dr.

_____

[2] Although the evaluator's comments are important for establishing Tatiana's background, the test results are not relevant for determining whether Tatiana is disabled because the tests were administered more than two years prior to her application for SSI and she was under seven years of age. See 20 C.F.R., Part 404, Subpt. P., App. 1, Part B, § 112.00D(10).

4

Pereira's evaluation reported that Tatiana was intellectually within the average range, but that she demonstrated inattentiveness, distractibility, and poor short-term memory. (R. at 117.)

On December 20, 2004, when Tatiana was in the third grade, the school completed an Individualized Education Program ("IEP") report on her behalf.  The December 2004 IEP reported that Tatiana had a "Learning Disability" and recommended that the school provide for Tatiana "[a] special class in a community school with related services," specifically, a class with a 12:1 student to teacher ratio.  (R. at 102.)  The Academic Performance and Learning Characteristics section of the IEP identified Tatiana as a friendly, active child, with average overall cognitive functioning.  (R. at 104.)  The document recognized, however, that Tatiana needed prompting and refocusing.  (R. at 104.)  The December 2004 IEP noted that "Tatiana's difficulties with attention require a great deal of assistance and redirection and necessitate a smaller classroom environment."  (R. at 111.)

According to the December 2004 IEP, Tatiana had reached instructional levels of between 2.0 to 2.3 for decoding, reading, listening, and writing skills, 1.8 for problem solving, and 3.0 for computation.  (R. at 104.)  Tatiana placed at an instructional level equal to her actual third grade level only

for computation. (R. at 104.) Tatiana's occupational therapist recommended that she spend another 30 minute session per week in occupational therapy because she was progressing slowly and demonstrating delays in problem solving and perceptual skills. (R. at 109.) The evaluator observed that Tatiana was qualified to participate fully in school activities, but recommended four participation modifications, including a one and one-half time extension, testing in a separate location, and having a teacher read questions and directions aloud. (R. at 113.) The report indicates that Tatiana would be promoted to the next grade only if she met 80% of the English Language Arts and Mathematics standards as evidenced by student work, teacher observation, and test grades. (R. at 113.)

On February 14, 2005, nearly a month after the plaintiff's filing for SSI, Tatiana's third grade teacher, Ms. Pagan, submitted a teacher questionnaire on Tatiana's behalf. According to the questionnaire, Ms. Pagan concluded that Tatiana had the most problems in the domains of attending and completing tasks and interacting and relating with others. (R. at 138-43.) Specifically, Ms. Pagan reported that Tatiana had several obvious problems with tasks or activities. (R. at 138-43.) With respect to the domain of caring for herself, Ms. Pagan commented that "Tatiana can be very emotional. She will cry if you reprimand her about playing or not paying attention." (R.

at 142.)  Ms. Pagan also reported that Tatiana ranked below grade level on the reading, writing, and math portions of Tatiana's most recent Early Childhood Literacy Assessment System ("ECLAS") evaluation. (R. at 145.)

On March 21, 2005, Alan Dubro, Ph.D., a school psychologist, evaluated Tatiana's intelligence by observing her behavior and administering two tests, the WISC-IV and the Wide Range Achievement Test, 3rd Edition ("WRAT-III").  (R. at 125-26.)  According to Dr. Dubro, Tatiana's motor behavior was relatively restless and fidgety during the evaluation.  (R. at 125.)  Dr. Dubro noted that Tatiana did not maintain eye contact consistently and required repetition of questions, but determined that Tatiana had good attention and concentration, and age-appropriate language skills.  (R. at 125.)  Dr. Dubro reported:

> On a daily basis, the claimant is able to dress, bathe, and groom herself at age appropriate levels only with close supervision.  She helps with simple household chores with close supervision.  Reportedly, the claimant becomes frustrated and has tantrums at home when she does homework as she is quite frustrated by academic tasks.  The guardian has to provide close supervision during this time.  She requires close supervision in school with academic tasks. The claimant is not permitted to travel in her neighborhood independently . . . .  Regarding the daily functioning of the claimant, she appears to be capable of attending to, following, and understanding age-appropriate directions with close supervision.  She appears to be able to complete age appropriate tasks with assistance . . . .  She is not consistently capable of learning at her level of cognitive functioning.

(R. at 126.)  Based on Tatiana's performance on the WISC-IV, Dr.

Dubro determined that Tatiana's full-scale IQ was 70, within the

borderline range of intelligence.  (R. at 126.)  The WRAT-III

standardized achievement measure yielded a standard score of 80,

a third grade equivalent, for reading/decoding.  (R. at 126.)

In conclusion, Dr. Dubro diagnosed Tatiana with: Axis I –

Learning Disorder NOS (Not Otherwise Specified) and Adjustment

Disorder with depressed mood, Axis II – Borderline Intellectual

Functioning, and Axis III – Amblyopia.[3]  (R. at 127.)  Dr. Dubro

recommended that Tatiana continue with her educational placement

and that she would benefit from counseling.  (R. at 127.)

Finally, Dr. Dubro reported that the "[r]esults of the present

evaluation are consistent with allegations."  (R. at 127.)  It

is unclear precisely what Dr. Dubro meant by this comment.

In a Childhood Disability Evaluation Form dated April 5,

2005, Karen Prowda, M.D., determined that Tatiana's impairment

or combination of impairments was severe, but did not meet,

---

[3]  The Diagnostic and Statistical Manual of Mental Disorders, Fourth
Edition, Text Revision ("DSM-IV-TR") lists psychiatric disorders of different
categories along with diagnostic code numbers for each category.  The
diagnostic code for Learning Disorder, Not Otherwise Specified, which is a
"category for disorders in learning that do not meet the criteria for any
specific Learning Disorder," is 315.9.  DSM-IV-TR 53 (2000).  The diagnostic
code for Mild Mental Retardation is 317.0.  DSM-IV-TR 43 (2000).  Axis I
refers to clinical disorders and other conditions that may be a focus of
clinical attention; Axis II refers to personality disorders and mental
retardation; and Axis III refers to general medical conditions.  DSM-IV-TR 27
(2000).

Amblyopia is defined as "[p]oor vision caused by abnormal development
of visual areas of the brain in response to abnormal visual stimulation
during early development."  Stedman's Medical Dictionary 16170 (27th ed.
2000).

medically equal, or functionally equal the listings for
disabilities in the SSA regulations.  (R. at 129.)  Dr. Prowda
assessed the degree of limitation that Tatiana experienced in
six domains, and concluded that Tatiana had less than marked
limitations in all domains.  (R. at 131-33.)  With respect to
the domain of acquiring and using information, Dr. Prowda wrote:
"WAIS reveals borderline range.  IQ of 1 year 4 months ago
revealed average IQ.  A recent IEP reveals average cognition.
The teacher report reveals a slight problem in aquiring [sic]
and using info."  (R. at 131.)  For the domain of attending and
completing tasks, Dr. Prowda reported that Tatiana was able to
perform tasks at an age-appropriate level with supervision, and
that Tatiana was in a 12:1:1 class because she required
assistance and redirection, but concluded that Tatiana had a
less than marked limitation in the domain.  (R. at 131.)  For
the domain of interacting and relating with others, Dr. Prowda
reported that Tatiana's speech and language skills, along with
her ability to relate to peers and adults, were age-appropriate.
(R. at 131.)  For the remaining domains of moving about and
manipulating objects, caring for yourself, and health and
physical well-being, Dr. Prowda also concluded that Tatiana's
limitations were less than marked.  (R. at 132.)

On November 17, 2005, Tatiana's teachers completed a second
IEP.  (R. at 150-60.)  Although the November 2005 IEP was not

identical to the December 2004 IEP, many comments and observations from the 2005 report are consistent with the 2004 report. For example, the evaluator in both reports determined that Tatiana's overall cognitive functioning fell within the average range, but noted that Tatiana needed refocusing and prompting to bring her back to task. (R. at 104, 152.) Other sections from the November 2005 IEP are identical to the corresponding sections in the December 2004 IEP. However, Tatiana's decoding, reading, listening, writing, and problem solving skills improved slightly from instructional levels of between 1.8 to 2.3 in 2004 (R. at 104), to between 2.4 and 2.8 in 2005 (R. at 152). Her computation skills level improved from 3.0 to 3.2. (R. at 104, 152.) Also, whereas the December 2004 IEP indicates that Tatiana would be promoted to the next grade only if she met 80% of the English language arts ("ELA") and mathematics standards (R. at 113), the November 2005 IEP indicates that Tatiana would be promoted to the next grade only if she met 50% of the ELA and mathematics standards (R. at 160). Finally, the November 2005 IEP listed small group instruction, seating in the front of all classrooms, and corrective glasses as Tatiana's academic management needs. (R. at 152.) Although the slight increases in these numbers indicates that Tatiana made progress, the numbers indicate that she nonetheless continued to fail to meet school standards.

In a document dated October 31, 2006, a Bronx Preparatory
Charter School ("BPCS") teacher completed a "Parent Report"
along with a questionnaire closely resembling an IEP.  (R. at
203-12.)  The Parent Report noted that, based on Tatiana's
results on the New York State Testing Program ("NYSTP"),[4] Tatiana
did not demonstrate the knowledge and skills required by the ELA
standards.  (R. at 203.)  Tatiana scored a "Level 1, Not Meeting
Standards," on the language portion of the test, but the
mathematics part is not included in the record.[5]  (R. at 204.)
The questionnaire indicates that Tatiana's actual grade level
was 5.0, but that her instructional levels in reading and math
were 2.5 and approximately 2.0, respectively.  (R. at 205.)
Unlike previous IEP's completed by Tatiana's teachers and
evaluators, which suggested that Tatiana had less than marked
limitations in all domains of functioning, the questionnaire
indicates that Tatiana had very serious problems and marked
limitations in the domains of acquiring and using information

<hr />

[4] The Parent report states, in part: "Beginning in 2005-06, students in
grades 3 through 8 must take part in the annual [NYSTP] for English language
arts (ELA) and mathematics.  These tests are required by No Child Left Behind
(NCLB) and are used by schools as a measure of student progress in meeting
NYS Learning Standards in English language arts and mathematics."  (R. at
203.)

[5] The second page of the Parent Report says, "To meet New York State
Learning Standards, students need to perform at Level 3 or above."  (R. at
204.)

and attending and completing tasks, respectively.[6]  (R. at 206-

12.)  Tatiana's BPCS teacher commented:

> Tatiana has very poor decoding skills.  Independent work is
> limited . . . .  [She] requires more teacher support that
> is not possible [sic] in a student teacher class of 20:1 .
> . . .  Learning Enhancement Team [at] Bronx Prep is working
> with the Committee on Special Ed from Region 1 to find
> Tatiana the appropriate class placement to meet her needs.
> As per her IEP, she belongs in a 12:1 class setting.

(R. at 206-07, 212.)

At the ALJ hearing on November 28, 2006, Tatiana was in

fifth grade at BPCS.  (R. at 214, 220.)  During the hearing,

which lasted approximately thirty minutes, the ALJ asked Tatiana

various questions, some of which concerned Tatiana's interests,

her performance in and attitude toward school, and her family.

(R. at 214-38.)  Tatiana testified that she had not passed math,

and that her homework was complicated for her.  (R. at 222-23,

236.)  Tatiana testified that she was no longer in occupational

therapy because BPCS did not have occupational therapy, that she

wore corrective lenses to help her read, that Ms. Williams, her

aunt and guardian, helped her with all assigned homework, that

she was driven to school and took the bus from school every day,

and that she periodically lost clothing.  (R. at 225-30.)

---

[6] The questionnaire indicates that, in the domains of acquiring and
using information and attending and completing tasks, Tatiana had very
serious problems with (1) comprehending oral instructions, (2) understanding
school and content vocabulary, and (3) comprehending and doing math problems,
and serious problems with (1) reading and comprehending written material, (2)
expressing ideas in written form, (3) learning new material, (4) recalling
and applying previously learned material, (5) applying problem-solving skills
in class discussions, (6) carrying out multi-step instructions, and (7)
organizing own things or school materials.  (R. at 206-07.)

Ms. Williams testified that BPCS was too advanced for
Tatiana because Tatiana required special education classes not
offered at BPCS, and that Tatiana was placed at BPCS through a
lottery. (R. at 233.) Ms. Williams testified that she had been
helping Tatiana with homework for five to six hours per night
since Tatiana transferred to BPCS, but that five to six hours
was not always a sufficient amount of time for Tatiana to
complete her work. (R. at 234.) Tatiana's attorney asserted
that Tatiana qualified for disability due to the combination of
her IQ score and learning disorder. (R. at 236-37.)

**II.**

A court may set aside a determination made by the
Commissioner only if it is based on legal error or is not
supported by substantial evidence in the record. See 42 U.S.C.
§§ 405(g), 1383(c)(3); Berry v. Schweiker, 675 F.2d 464, 467 (2d
Cir. 1982). Substantial evidence is "more than a mere
scintilla"; it is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson
v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co.
v. NLRB, 305 U.S. 197 (1938)); see also Diaz v. Shalala, 59 F.3d
307, 312 (2d Cir. 1995); Rivera v. Sullivan, 923 F.3d 964, 967
(2d Cir. 1991); Acevedo v. Barnhart, 05 Civ. 8117, 2007 WL
1982753, at *3 (S.D.N.Y. July 3, 2007). When reviewing the
record for substantial evidence, a court will consider the

record as a whole, meaning that the court "will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it." Campos ex rel. Cruz v. Barnhart, No. 01 Civ. 10005, 2003 WL 21243036, at *4 (S.D.N.Y. May 28, 2003) (citing State of New York v. Sec'y of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990)). However, in considering the entire record, "[i]t is not the function of the reviewing court to determine de novo whether a claimant was disabled." Cruz ex rel. Vega v. Barnhart, No. 04 Civ. 9794, 2005 WL 2010152, at *8 (S.D.N.Y. Aug. 23, 2005) (quoting Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000)).

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), made applicable to SSI claims by 42 U.S.C. § 1383(c)(3), a court may enter "a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.'" See Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991). Although the ALJ's assessments of credibility are entitled to deference, a court may remand the case for further evidentiary proceedings if the record indicates that the ALJ committed legal error, or if the record does not contain substantial evidence to support the ALJ's decision. Vega, 2005 WL 2010152, at *8. "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the Court of Appeals has], on numerous occasions, remanded to the

[Commissioner] for further development of the evidence." Rosa, 168 F.3d at 82-83 (internal quotation marks and citation omitted). "However, where 'the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,'" the court may reverse the decision of the ALJ, enter judgment for the claimant, and remand the case solely for the calculation of benefits. Castillo v. Barnhart, No. 00 Civ. 4343, 2002 WL 31255158, at *14 (S.D.N.Y. Oct. 8, 2002) (quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)); see also Rosa, 168 F.3d at 83 ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.").

A claimant under the age of eighteen seeking SSI benefits is disabled if the claimant "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). However, "no individual under the age of 18 who engages in substantial gainful activity . . . may be considered to be disabled." 42 U.S.C. § 1382c(a)(3)(C)(ii).

The regulations prescribe a three-step sequential evaluation process to determine whether a child is disabled so

as to qualify for SSI payments.  See 20 C.F.R. § 416.924(a);

Quinones v. Chater, 117 F.3d 29, 33-34 (2d Cir. 1997).  First,

the Commissioner determines whether the child is engaged in

substantial gainful activity, which is described at length in 20

C.F.R. §§ 416.971–416.976.  20 C.F.R. § 416.924(b).  If the

child is engaged in substantial gainful activity, the child is

not disabled.  If the child is not engaged in substantial

gainful activity, the Commissioner proceeds to the second step

to determine whether she has a medically determinable severe

impairment or combination of impairments.  20 C.F.R. §

416.924(c).  The regulation provides: "If you do not have a

medically determinable impairment, or your impairment(s) is a

slight abnormality or a combination of slight abnormalities that

causes no more than minimal functional limitations, we will find

that you do not have a severe impairment(s) and are, therefore,

not disabled."  20 C.F.R. § 416.924(c).  If the child does not

have a severe impairment, she is not disabled.

    If the child does have a severe impairment or combination

of impairments, the Commissioner proceeds to the third step to

determine whether the impairment or impairments meet, medically

equal, or functionally equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 of the regulations ("Listings of

Impairments").  See 20 C.F.R. §§ 416.924(a),(d).  In this step,

the Commissioner considers the interactive and cumulative

16

effects of all medically determinable impairments, even those that are not severe.  See 20 C.F.R. §§ 416.923, 416.924a(b)(4), and 416.926(c).

If a child's impairment does not meet the listings, she may qualify as disabled if her impairment medically or functionally equals the listings.  An impairment medically equals the listings if it is at least equal in severity and duration to the criteria of any listed impairment.  20 C.F.R. § 416.926(a).

If the child's impairment does not meet or medically equal the listings, the Commissioner considers whether the impairment results in limitations that functionally equal the listings.  To functionally equal the listings, the impairment "must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."  20 C.F.R. § 416.926a(a).  A marked limitation in a given domain means that a child's impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."[7]  20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation in a given domain means that a child's impairment "interferes very

_____

[7] The regulations further provide:  "Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  20 C.F.R. § 416.926a(e)(2)(i).

seriously with [the child's] ability to independently initiate, sustain, or complete activities."[8]  20 C.F.R. § 416.926a(e)(3)(i).  To determine whether a child has a marked or extreme limitation, the Commissioner assesses what the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of her impairment, in six domains of functioning: (1) Acquiring and using information; (2) Attending and completing tasks; (3) Interacting and relating with others; (4) Moving about and manipulating objects; (5) Caring for yourself; and (6) Health and physical well-being.  20 C.F.R. §§ 416.926a(a)-(b).

The Commissioner considers all test scores and other relevant facts in the record, compares how appropriately, effectively, and independently the child performs activities with other children of the same age who do not have impairments, and characterizes the child's functional limitations in each domain as extreme, marked, less than marked, or not a limitation.  20 C.F.R. § 416.926a(b).  If the Commissioner determines that the child has two marked limitations or one

---

[8] The regulations further provide:  "Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  'Extreme' limitation also means a limitation that is 'more than marked.'  'Extreme' limitation is the rating we give to the worst limitations.  However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  20 C.F.R. § 416.926a(e)(3)(i).

extreme limitation, then the child's impairment is functionally equivalent to the listings.

**III.**

Applying the three-step sequential evaluation, the ALJ found that Tatiana did not qualify for disability under the SSA regulations because her impairments did not meet, medically equal, or functionally equal the listings.  (R. at 13-24.)

The ALJ first determined that Tatiana "has not engaged in substantial gainful activity at any time relevant to this decision."  (R. at 19.)  Neither party objects to this part of the ALJ's determination.  At the second step, the ALJ determined that Tatiana's borderline intellectual functioning was a medically determinable severe impairment, but found that amblyopia was not severe because "[Tatiana's] vision is well-corrected with glasses."[9]  (R. at 19.)  The ALJ did not mention whether Learning Disorder NOS and Adjustment Disorder with depressed mood, diagnosed by Dr. Dubro, met the criteria for medically determinable severe impairments.

At the third step of the analysis, the ALJ determined that Tatiana did not have an impairment or combination of impairments that met or medically equaled any of the mental disorders listed in § 112.00 of the Listing of Impairments.  (R. at 19.)  In response to the plaintiff's allegation that Tatiana met Listing

---

[9] The plaintiff does not contend that amblyopia is a severe impairment.

112.05D with the other mental impairment of her learning disorder, the ALJ concluded that Tatiana's learning disorder did "not qualify as an 'other' impairment from borderline intellectual functioning, as they are essentially one and the same." (R. at 19.)

After finding that Tatiana's impairments did not meet or medically equal the listings, the ALJ determined that her impairments did not functionally equal the listings. (R. at 19-24.) The ALJ found that Tatiana had a marked limitation in the domain of acquiring and using information, but a less than marked limitation in attending and completing tasks, and no limitations in the other domains. (R. at 20-24.) In determining the degree of limitation in each of the six domains, the ALJ considered all evidence, signs, and symptoms, and reported that "[t]he claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but . . . the statements concerning the intensity, persistence, and limiting effects of the claimant's symptoms are not entirely credible." (R. at 19.) Therefore, the ALJ determined that Tatiana did not have an impairment that functionally equaled the listings.

### IV.

The Commissioner cross moves for an order reversing the Commissioner's decision and remanding this case for further

proceedings pursuant to the fourth sentence of 42 U.S.C. §
405(g).  A remand may be made pursuant to the fourth sentence of
§ 405(g) in cases in which the Commissioner has failed to
provide a full and fair hearing, to make explicit findings, or
to have correctly applied the law and regulations.  Rosa, 168
F.2d at 82-83.  The ALJ has a duty to develop the record, and
the failure to do so warrants a remand for further development.
See Vega, 2005 WL 2010152, at * 8 (citing Butts v. Barnhart, 388
F.3d 377, 386 (2d Cir. 2004)).

        The Commissioner concedes that, in making his determination
the ALJ did not fully develop the record by obtaining, or
seeking to obtain, Tatiana's most recent IEP.  This omission is
significant because the last IEP that was included in the
record, from November 2005, was prepared more than a year before
the ALJ rendered his decision.  (See R. at 21, 150-60.)  There
is also no documentation to explain why the child was moved from
a special education setting to a regular class setting.  Other
conflicts within the existing record are apparent.  For example,
the 2004 and 2005 IEPs show that Tatiana was delayed
academically, but also noted that her overall cognitive
functioning was in the average range.  (See R. at 104, 152.)
The BPCS teacher questionnaire also indicates that she had
significant problems in the domains of acquiring and using
information and attending and completing tasks.  (See R. at 206-

07.)  However, no school psychologist or mental health
professional diagnosed Tatiana with mental retardation or any
other conditions, such as attention deficit disorder or
hyperactivity, that would suggest that her limitations were
disabling.  As explained below, there was also no analysis by a
mental health professional that sought to differentiate between
Tatiana's low IQ and the diagnosis of a learning disorder, or to
assess whether the learning disorder resulted in additional and
significant limitations on function.  Further development of the
evidence, including medical expert testimony, is therefore
necessary.

**V.**

The plaintiff submits, however, that the record already
contains sufficient evidence to conclude that Tatiana meets §§
112.05D, 112.05E, and 112.05F of the listed impairments or,
alternatively, that Tatiana's limitations are functionally
equivalent to the listed impairments.  The plaintiff contends
that the evidence is so clear that no remand for further
development of the record is necessary.

According to the regulations, all listed impairments under
§ 112.05, the regulation relating to mental retardation in
children, are "characterized by significantly subaverage general
intellectual functioning with deficits in adaptive functioning.
The required level of severity for this disorder is met when the

22

requirements in A, B, C, D, E, or F are satisfied."  20 C.F.R.
Pt. 404, Subpt. P, App. 1, § 112.05.

**A.**

The first prong of § 112.05D requires that a claimant have
"[a] valid verbal, performance, or full scale IQ of 60 through
70."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05D.  The
second prong requires that the claimant have "a physical or
other mental impairment imposing an additional and significant
limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §
112.05D.

Pursuant to § 112.00A of the listings, the standard for
whether an impairment inflicts an "additional and significant
limitation of function" is whether the impairment is severe
under 20 C.F.R. § 416.924(c).  See Pimentel v. Barnhart, No. 04
Civ. 3769, 2006 WL 2013015, at *13 (S.D.N.Y. July 19, 2006); see
also Campos, 2003 WL 21243036, at *8.

Thus, to satisfy the second prong, the claimant must
demonstrate that an impairment or combination of impairments,
separate and distinct from a low IQ, imposes more than a slight
or minimal limitation on the claimant's functioning.  The
plaintiff claims that Tatiana's Learning Disorder NOS and
Adjustment Disorder with depressed mood, whether viewed in
isolation or combined, satisfies this second prong.

It is plain that mental retardation is different from a learning disorder. The Commissioner has issued guidance in the Childhood Disability Evaluation Issues, Social Security Administration Office of Disability, SSA Pub. No. 64-076 (March 1998), that mental retardation requires both significantly subaverage general intellectual functioning and deficits in adaptive functioning. Id. at 43. A learning disorder is an impairment in its own right separate from mental retardation. Id. The DSM-IV-TR has separate diagnoses for Learning Disorder and Mental Retardation. DSM-IV-TR 41, 56. The Commissioner notes that the differentiating factor for a learning disorder is not the number of areas of learning that are affected, but the fact that academic performance is not commensurate with intellectual ability. Childhood Disability Evaluation Issues at 47. Therefore, a learning disorder can exist even in the presence of a primary diagnosis of mental retardation and thus may satisfy the second prong of § 112.05D. See id. at 49 n.10 ("A diagnosis of LD . . . can serve as an additional and significant impairment under Listings 112.05D and F."). In such cases, where a claimant may have a combination of a learning disorder and mental retardation or borderline intellectual functioning, the Commissioner urges that a medical professional be consulted. Id. at 47, 55.

In Tatiana's case, the ALJ dismissed the learning disorder as a separate impairment from the low IQ threshold required for a finding of mental retardation under § 112.05D on the grounds that a learning disorder "does not qualify as an 'other' impairment from borderline intellectual functioning, as they are essentially one and the same." (R. at 19.) This was error because a learning disorder is a separate impairment from borderline intellectual functioning and it was necessary for the ALJ to have determined whether the learning disorder was correctly evaluated and whether it resulted in additional and significant limitations which were in fact different from borderline intellectual functioning.

Other courts have concluded that a learning disorder may qualify as an impairment causing an additional and significant limitation for purposes of satisfying the second prong of § 112.05D as long as the learning disorder is "a distinct diagnosable disorder, rather than a symptom or manifestation of [the plaintiff's] low I.Q." Brown v. Comm'r of Soc. Sec., 311 F. Supp. 2d 1151, 1162 (D. Kan. 2004); see also Burden v. Comm'r of Soc. Sec., 05 Civ. 846, 2008 WL 2778848, at *7 (N.D.N.Y. July 14, 2008); Hall v. Apfel, 122 F. Supp. 2d 959, 967 (N.D. Ill. 2000).

In Brown, the court determined that the plaintiff failed to establish that the claimant's "learning disorder [was] a

distinct diagnosable disorder rather than a symptom or manifestation of her low I.Q.," because the record contained no evidence that the plaintiff's learning difficulties were anything other than symptoms of her low IQ, and the plaintiff did not assert that her learning disorder was additional and significant. Brown, 311 F. Supp. 2d at 1162. The court thus decided that the plaintiff's learning disorder did not impose an additional and significant limitation of function. Id. In contrast, the plaintiff here expressly asserted that her learning disorder satisfied the second prong of § 112.05D at the hearing before the ALJ, and Dr. Dubro's diagnosis, conducted pursuant to the DSM-IV-TR, indicated that her learning disorder could have been a distinct diagnosable disorder that imposed an additional and significant limitation of function.

This case is thus similar to Burden. In that case the court found that, in addition to the requisite low IQ, there was evidence that the child was repeatedly diagnosed as having a learning disability which may have imposed an additional and significant limitation of function. Burden, 2008 WL 2778848, at *7. The court therefore remanded the case to the Commissioner for further consideration in view of the lack of a proper analysis. Id.

The Commissioner argues that a learning disorder is not an additional impairment to a low IQ. In support of this

proposition, the Commissioner cites Buckner v. Apfel, 213 F.3d
1006 (8th Cir. 2000). Buckner determined that the evidence that
the claimant suffered from a physical or additional mental
impairment that limited her ability to work was not so
overwhelming as to warrant an immediate disability finding under
§ 12.05C, the adult equivalent of a childhood mental retardation
finding under § 112.05D.[10] Id. at 1012. However, in that case
the court listed "learning disability" among several other
factors cited by the claimant and did not cite any diagnosis by
a medical professional that the claimant suffered from a
learning disorder, and the court concluded that most of the
asserted impairments were merely symptoms or manifestations of
the claimant's mental retardation. Id. In this case, there was
a separate diagnosis of a learning disorder by a psychologist,
and there was no analysis by the ALJ that the learning disorder
was a symptom or manifestation of a low IQ rather than a
separate disorder.

The ALJ also did not explain whether Tatiana's Learning
Disorder NOS was severe under 20 C.F.R. § 416.924(c). He
dismissed it as essentially the same as borderline intellectual
functioning, which it is not. There is no analysis in the
record of whether, in this case, the learning disorder does

---

[10] The mental retardation listing for children, § 112.05D, is
substantially similar to the corresponding listing in § 12.05C for adults.
Castillo, 2002 WL 3125518, at *12; see also Bryant v. Apfel, 141 F.3d 1249,
1252 (8th Cir. 1998); Hall, 122 F. Supp. 2d at 965.

cause additional and significant limitations on the claimant's functioning.  This analysis should be done in the first instance by the ALJ with the assistance of a medical professional.  The Court could not conclude that the evidence of a severe impairment in addition to the claimant's low IQ is so persuasive that a finding of disability is required and only a remand for a calculation of benefits is warranted.  See Burden, 2008 WL 2778848, at *7.

The plaintiff also argues that Dr. Dubro's finding that Tatiana had an Adjustment Disorder with depressed mood was an independent severe impairment that satisfied the second prong of § 112.05D.  However, the plaintiff did not argue to the ALJ that this condition was a sufficient additional impairment to satisfy § 112.05D, and the ALJ did not specifically mention it in denying the plaintiff's claim under that provision.  (R. at 19, 236-37.)  The plaintiff also did not raise the Adjustment Disorder before the Appeals Council.  (R. at 10-12.)  The Supreme Court has held that a claimant does not waive judicial review of an issue by failing to raise it before the Appeals Council, but has not decided whether failure to raise an issue before the ALJ waives judicial review of the issue.[11]  See Sims

---

[11] Some Courts of Appeals have held that failure to raise an issue before the ALJ waives judicial review of the issue, at least where the claimant was represented by counsel before the ALJ.  See, e.g., Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (holding that claimant's failure to allege that his obesity was an impairment in his application for benefits

28

v. Apfel, 530 U.S. 103, 107, 112 (2000).  Even if the
plaintiff's failure to raise the issue before the ALJ does not
waive judicial review of the issue, the Court could not find
that the evidence was so persuasive that the alleged Adjustment
Disorder was an additional severe impairment that the Court
should make a determination of disability.  There is no evidence
of any treatment for this alleged condition, and the record
reflects that there is significant evidence that Tatiana behaved
well, was friendly, and related well to her peers and teachers.
(See R. at 104-05, 117, 140, 153.)

Finally, because a remand is appropriate in this case, the
Commissioner can consider all of the evidence, including any
assistance from a medical professional, to determine whether
Tatiana has any psychological condition, including a learning
disorder or an adjustment disorder, which is a severe impairment
in addition to her low IQ.

**B.**

The plaintiff also argues that Tatiana satisfied the
requirements of § 112.05E and § 112.05F.  This argument also was
not raised before the ALJ or the Appeals Council.  (See R. at
19, 236-37.)  In any event, the record is not so persuasive on

---

or during his hearing waived on appeal his claim that the ALJ failed to
consider his obesity as an impairment); Meanel v. Apfel, 172 F.3d 1111, 1115
(9th Cir. 1999) ("[A]t least when claimants are represented by counsel, they
must raise all issues and evidence at their administrative hearings in order
to preserve them on appeal.").

disability under these standards that the Court could enter such a finding, but the Commissioner should consider these issues on remand in light of a fully developed record.

**1.**

To meet the first prong of § 112.05E, a claimant must first have "[a] valid verbal, performance, or full-scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.05E. As explained above, Tatiana meets this requirement. To meet the second prong of § 112.05E, a claimant must satisfy at least one of paragraphs B(2)(b), B(2)(c), or B(2)(d) of 112.02, which requires that the claimant have:

> (b) Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> (c) Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> (d) Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02B(2)(b)-(d).

The plaintiff submits that Tatiana displays marked limitations in the area of maintaining concentration,

persistence, and pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

112.02B(2)(d).  A marked limitation, for purposes of the

listings, is "more than moderate but less than extreme."  20

C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00C.  More concretely:

> A marked limitation may arise when several activities or
> functions are impaired, or even when only one is impaired,
> as long as the degree of limitation is such as to interfere
> seriously with the ability to function (based on age-
> appropriate expectations) independently, appropriately,
> effectively, and on a sustained basis.

(Id.)

The ALJ's decision does not address whether Tatiana has

marked limitations in this area of functioning, or whether her

impairment or combination of impairments meets § 112.05E of the

listings.  Although some evidence in the record indicates that

Tatiana's limitation in the area of maintaining concentration,

persistence, and pace interferes seriously with her ability to

function independently, appropriately, effectively, and on a

sustained basis, there is not such persuasive proof in the

record so as to preclude further evidentiary proceedings.

Dr. Dubro noted that Tatiana's attention and concentration

were good.  (R. at 125.)  Dr. Prowda also reviewed the record

and found that the limitation on Tatiana's ability to attend and

complete tasks was "less than marked."  (R. at 131.)  More

recently, Tatiana's BPCS teacher noted that she had no problems

paying attention when spoken to or sustaining attention during

activities and sport.  (R. at 207.)  The teacher also noted that Tatiana had only slight problems in numerous related activities, such as:  focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out single-step instructions, waiting to take turns, completing class and homework assignments, working at a reasonable pace and finishing on time and completing work assignments accurately without careless mistakes.  (R. at 207.)  While Tatiana had a greater degree of problems in changing activities, working without distraction, and completing multi-step instructions, the teacher indicated that any problems in these activities occurred weekly at most.  (R. at 207.)

Further development of the record is required.  On remand, the Commissioner should specifically address whether Tatiana's impairments meet § 112.05E of the Listings.

**2.**

To meet § 112.05F of the Listings, a claimant must first show that she meets § 112.02B(2)(a), which requires:  "Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological

32

tests." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02B(2)(a).
This section does not require an IQ or equivalent test result.
See Campos, 2003 WL 21243046, at *7.  The second prong of §
112.05F is identical to the second prong of § 112.05D, discussed
above.  The ALJ did not explicitly consider this standard.
However, for reasons similar to those discussed above with
respect to § 112.05D, there is insufficient proof in the record
that Tatiana satisfies this requirement so as to preclude
further evidentiary proceedings.  Therefore the Commissioner
should specifically address whether Tatiana's impairments meet §
112.05F of the Listings on remand.

### C.

The plaintiff finally submits that the record contains
persuasive proof that Tatiana had marked limitations in the
domains of attending and completing tasks and acquiring and
using information, and that therefore, her impairments
functionally equal the listings.  The ALJ found that Tatiana had
a marked limitation in acquiring and using information but a
less than marked limitation in the domain of attending and
completing tasks.  According to the plaintiff, the only evidence
proffered by the ALJ to support the conclusion that Tatiana did
not have a marked limitation in the domain of attending and
completing tasks actually supports a conclusion that Tatiana had

a marked limitation in this domain.[12]  Although the ALJ's

determination that Tatiana had a less than marked limitation in

the domain of attending and completing tasks was less than

thorough, the Court could not conclude that the evidence was so

persuasive that a remand would serve no purpose.  For similar

reasons to those explained above under § 112.05F, there is

evidence that shows Tatiana's impairment in the domain of

attending and completing tasks was less than marked.  However,

as with the other possible bases for disability, the

Commissioner should consider this basis on remand.

### CONCLUSION

For the reasons explained above, the plaintiff's motion for

judgment on the pleadings is **denied.**  The Commissioner's cross-

motion to reverse the decision of the Commissioner and to remand

the case for further proceedings is **granted.**  The case is

remanded to the Commissioner for additional administrative

proceedings consistent with this Opinion and Order.  The Clerk

---

[12] Concluding that Tatiana had a less than marked limitation in this domain, the ALJ stated:

> A December, 2004 and a November, 2005 Individualized Education Program report indicate that she needs prompting and refocusing.  At the consultative evaluation, she was noted to be relatively restless and fidgety and required repetition of questions, but her attention and concentration was good.  A teacher's report stated that the claimant has some problems in this area and requires more teacher support than is possible in a class with a student/teacher ratio of 20 to 1.

(R. at 21.)

is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:**     **New York, New York**
              **October 24, 2008**

John G. Koeltl
United States District Judge